Filed 3/23/23  P. v. Ortiz CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>GABRIEL ANTHONY ORTIZ,<br><br>        Defendant and Appellant. | E078563<br><br>(Super. Ct. No. INF1801137)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County.  Dale R. Wells, Judge.

Affirmed.

Michael C. Sampson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland , Assistant Attorney General, Steve Oetting and Daniel J. Hilton, Deputy Attorneys General, for Plaintiff and Respondent.

1

I.

INTRODUCTION

Defendant and appellant Gabriel Ortiz appeals from the judgment entered following jury convictions for two counts of felony sexual abuse of Jane Doe, a 20-year-old woman who has physical, cognitive, and communicative disabilities. A jury convicted defendant of raping a developmentally disabled person (Pen. Code, § 261, subd. (a)(1); count 1) and oral copulation with a developmentally disabled person (Pen. Code, § 287, subd. (g); count 2). The trial court sentenced defendant to six years in prison.

Defendant contends the trial court erred in admitting into evidence Doe's videotaped police and forensic interviews. We conclude that, regardless of whether there was any abuse of discretion in admitting the two interview videos, any such error was harmless. We therefore affirm the judgment.

II.

FACTS

Doe suffers from physical disabilities, including cerebral palsy, seizure disorder, asthma, ulcerative colitis, and cognitive disabilities which affected her speech, learning, and comprehension. Doe cannot read or write very well and is unable to speak clearly. Doe attended a special education high school program from age 14 until she was 20 years old, during which she took special classes for students with disabilities. At the time of trial, she was 24 years old. Doe worked three days a week as a cleaner at a thrift store

2

that employed people with special needs. According to her mother (Mother), Doe would never be able to live alone. Mother was very protective of Doe.

A. *Dr. Fraschetti's testimony*

Doe's pediatrician, Dr. Fraschetti, testified that he had treated Doe for 11 years, from when she was nine or 10 years old, until March 2018, when she was 20 years old. Dr. Fraschetti observed she was developmentally delayed and "had [a] lack of speech." Doe was only able to answer yes or no questions. Over the 11 years Dr. Fraschetti treated Doe, her cognitive and speech abilities remained about the same. She still was speech delayed. She was able to say a few more words but was not able to participate in a conversation. At age 20, Doe was not able to care for herself, transport herself, or support herself financially. Doe did not behave like a typical 20-year-old. She was "[v]ery immature" and unable "to understand . . . what sexual intercourse [was]."

B. *Doe's Trial Testimony*

In January 2018, Mother permitted Doe to spend three nights at the home of a former high school girlfriend, M.R., and her mother. Doe was 20 years old at the time. Doe testified in her limited capacity, with yes-no answers and brief responses, as in her videotaped interviews, that defendant was her friend's boyfriend and the father of M.R.'s baby. On January 4, 2018, Doe and M.R. visited defendant at his apartment. Defendant had sex with M.R. in Doe's presence. Doe testified she did not know what M.R. and defendant were doing. She did not know then what sex was.

3

After having sex with M.R., defendant took off Doe's jeans and underwear in M.R.'s presence. Doe testified she did not want defendant to do so. Defendant then put his body part, a penis, in her mouth and in her body part where her pee came out. Afterwards, he put his body part back in his shorts and dressed Doe.

Doe testified she did not want defendant to put his penis in her mouth or vagina. When defendant did this, she did not know what he was doing. Nothing like that had happened to her before. Doe testified she was scared when it happened. She did not tell defendant not to do it and did not push him away. M.R. did not say anything when it happened.

The next morning, January 5, 2018, Doe left defendant's apartment and returned to M.R.'s apartment. Doe did not have her phone with her at defendant's apartment because she had left it at M.R.'s apartment. When Doe returned to M.R.'s apartment, she called Mother, who picked her up and took her to the hospital. Mother testified that when she picked up Doe at M.R.'s, Doe was upset and appeared scared. She was not smiling and was crying a bit. This was unlike her normal behavior. Normally, she was outgoing and smiling.

Doe testified she did not tell Mother what had happened until they got to the hospital. At the hospital, she had a videotaped interview by Sheriff's Deputy Potter (police interview) and a physical examination. Nurse Diana Faugno, and sexual assault counselor, Lisa Olson, were present during the videotaped police interview. Faugno

4

noted that Mother, who was waiting outside the interview room, had said Doe did not speak very well and "it's . . . difficult to understand her."

C. *Deputy Potter's Testimony and Police Interview of Doe*

During the police interview of Doe, Potter asked Doe what happened. Doe initially was silent, other than saying "Mm" or "Mm-hm" after numerous attempts by Potter to urge Doe to say a few words about what had happened. Olson noted that Doe was shaking and told her it was okay. Olson told Doe to take deep breaths, encouraged her, and reassured her that she was safe there. Potter asked Doe, "Any word- any word that comes to your mind." "I see there's probably quite a few words back there. Sometimes, it's hard to get those words out," "It's hard, isn't it?," "what word kinda sits right on the top of your forehead that you wanna tell us? It could be more than one word, but we'll take one word."

Finally, after numerous responses of "Mm" to Potter's inquiries, in response to being asked, "Can you tell me the name of the person?," Doe said, "I don't know." When Potter and Olson asked Doe additional questions, Doe continued to respond, "Mm" or "Mm-hm." When asked if the perpetrator (defendant) was "white," "black," or "brown," Doe said, "Brown." The interview proceeded in this fashion, with occasional one word responses by Doe, interspersed with numerous responses of "Mm-hm" and nods of the head. In response to Potter asking if defendant was Hispanic, Doe said, "Hispanic." When asked if he was "big" or "thin," Doe said, "Thin." When asked what

5

color were his eyes, she said, "Brown." When asked when the incident occurred in the morning or afternoon, Doe said, "Afternoon."

Faugno asked Doe where the incident happened. Doe said, "His house." Potter asked if defendant stayed in the apartment complex where Doe lived and asked if she knew his apartment number. Doe responded, "Mom does." Faugno asked if the incident happened on the floor on a mattress on the floor or on a rug. Doe said, "Rug."

Potter asked Doe if the incident happened the day before, in the morning, afternoon, or night. Doe said, "Night." When asked how she ended up at defendant's home, she said, "I don't know." Potter asked Doe if, while at his home, he said anything to her before anything happened. She said, "No." Potter asked if defendant touched her on top of or underneath her clothing. Doe said, "Underneath my clothes." Potter asked if he touched her on top or under her underwear. Doe said, "Underneath my underwear." When asked if defendant tried to kiss her, she said, "No." Doe said she did not remember how she ended up on the ground. Potter asked Doe if defendant was standing, leaning over, or down on his knee when taking off her pants. She said, "Both knees." When asked if defendant was straddling her on his knees or on one side of her, Doe said, "On one side," which was her "Left" side. When asked if defendant moved Doe's legs and to demonstrate how he did so, Doe said, "Open."

Potter asked Doe if defendant asked her to touch him or took her hand and made her do so. She indicated he did, and when asked if it happened before or after he opened her legs, Doe said, "Before." When asked where defendant put her right hand, Doe said,

6

"Here." When asked if he made her touch him over or under his underwear, Doe said, "Underneath the underwear." Potter asked if his pants were already unbuttoned or were buttoned. Doe said, "Unbuttoned." When asked if defendant unbuttoned his pants or he made Doe unbutton them, Doe said, "He unbuttoned."

Potter asked if defendant put her hand on his penis and made her do anything. Doe said, "Put it in my mouth." When asked if defendant was on his knees by her legs, Doe said, "In between." Potter asked Doe if when defendant made her open her legs, that was before or after he put his penis in her mouth. She said, "It was after." When asked how defendant got his penis in her mouth, Doe said, "He walked."

Potter asked Doe what defendant did when he moved up near her head. She said, "I don't know." Olson suggested Doe take a deep breath, and told her good job. Then Doe said, "He pulled my hair." Potter asked if she used one or both hands. Doe said, "Just one." When asked which hand, Doe said, "His right hand."

Potter asked Doe what happened next. Olson urged Doe to demonstrate with her hand, adding that "it's always okay to cry. This is a cry zone. Okay? It helps us get it out. So, it's okay to cry. Don't try to hold that back. It helps us talk about it. Okay? Can you show us with your finger? Okay. Show me what he did. It's okay. Little by little. Take a deep breath if you need to. Did it have something to do with your legs? Okay." Doe responded that "He put his [inaudible] in," indicating his penis and demonstrating he moved it in and out of her mouth. When asked how long defendant's

penis was in her mouth, she said, "Five minutes." Potter asked Doe what happened next. She said, "He opened my legs."

During the interview, Faugno explained to Potter that Doe was with a special needs girlfriend at the time of the incident. The two young women had gone to visit the girlfriend's boyfriend, defendant, at defendant's apartment. Defendant was the father of the girlfriend's baby. After the incident, the girlfriend's mother called Mother and told her what happened.

Potter then resumed the interview, asking Doe what defendant did next after he opened up her legs. Doe responded, "He put it inside." Doe demonstrated with a stuffed teddy bear. Potter asked her what happened when he put his penis inside her. Doe said, "He moved it." When asked how, Doe said, "Back and forth." Potter asked Doe if it went inside her or was outside against her. Doe said, "Inside me." Potter asked Doe how many times defendant moved his penis back and forth inside her. She said, "Two times."

Potter asked Doe what defendant did after that. She said, "I don't know." Doe showed Potter with the stuffed bear but did not audibly describe his actions. Potter asked Doe what he did when he closed her legs. Doe said, "Put my pants on," and put her clothes back on. Potter asked Doe what happened after her underwear and pants were back on and defendant's penis was back in his pants. Doe said, "Nothing." Potter asked if Doe then left or stayed there. She said, "Went friend's house."

When Olson asked Doe if she had seen defendant before, Doe responded, "Uh-huh." She said, "Unh-unh" when asked if "yesterday" was the first time she had seen

8

him.  She also indicated that defendant had never done anything before to her like he had just done.

D. *Denise Bowman's testimony and Forensic Interview of Doe*

On January 9, 2018, forensic interviewer, Denise Bowman, conducted a videotaped forensic interview of Doe (forensic interview).  She noted that interviewing developmentally delayed adults is very difficult.  Therefore, depending on the severity of the disability, a patrol officer, detective, or social worker may request a forensic interviewer to conduct the interview.  Bowman noted that Doe had difficulty with speech and was not able "to narrate information freely."  Bowman therefore asked Doe yes-no questions and multiple choice questions.  Doe could say some comprehensible words and also said some words Bowman could not understand.  The video of Bowman interviewing Doe was shown to the jury.  Defense counsel did not object to the video at that time.  Afterwards, Bowman testified that, based on Doe's interview responses, "it sounded as though . . . there was a sexual encounter and that [Doe] didn't want to.  That is what she said."

The video of Doe's forensic interview reflects that Doe was more relaxed and more responsive when asked questions about the charged crimes, but still reluctant to talk about the incident.  When Bowman asked Doe why she was there, what happened to her, and who hurt her,  Doe said, "I don't know."  Bowman asked if Doe could write the name of the person who hurt her.  Doe said, "No."  When asked who took her to the hospital, Doe said, "My mom."  Doe acknowledged she liked boys but said she did not "hang out"

9

with them, other than a little bit.  When asked where she met them or saw them, Doe said, "I don't know."  Bowman asked Doe the name of the name of her friend she hung out with and where she met her.  Doe said, "At school."

Bowman again asked Doe what happened to her and who brought her there.  Doe said, "My mom."  Bowman asked Doe if someone touched her on the body and who it was.  Doe said, "Gabriel."  Bowman noted that adults, such as she and Doe, might like someone a little, "just for the night or whatever.  Just for a little time and hang out and maybe do some stuff?  Um, did you wanna do that with Gabriel?"  Doe replied, "No."  Bowman asked Doe if she told him she wanted to do "stuff" with him.  Doe again said, "No."  Bowman asked, "You didn't tell him?  No?  Um, what did he do to you?"  Doe said, "He touched me."

Bowman showed Doe a picture of a girl and a boy and asked her to circle where defendant touched her.  Doe complied, and said, "Here."  Bowman asked if he touched her anywhere else, pointed to the picture and asked, "What do you call these?"  Doe said, "Boobs."  Bowman asked if defendant touched them and Doe said, "No."  Bowman asked Doe what the place where pee comes out was called.  Doe said, "Pee."  Bowman asked Doe what defendant's "part" that he peed with felt like.  Doe said, "I don't know."  Bowman asked Doe where her clothes went.  She said defendant "Took them off."  When asked if defendant said anything to Doe, she said, "No."

Bowman asked where her girlfriend was.  Doe said, "I don't know."  And then said she was at defendant's house.  Bowman asked who wanted to go there.  Doe said her

friend did.  Bowman asked if defendant did "this to just you or to her" or to both, and

"[w]ho does he do this first to."  Doe said, "Her."  Bowman asked, "Her?  So Gabriel

does her first and he puts his- his boy part in hers?  And does she wanna do that or she

doesn't wanna do it or what?"  Doe responded, "Her wants to."  Bowman asked Doe,

"That was your first time.  Okay.  You've never done it before?  No?"  Doe said, "No."

Bowman asked Doe, "[H]ow did someone find out?  Who did you tell?"  Doe

responded, "Her mom."  Bowman asked Doe if her girlfriend said anything to defendant

"when he was doing this?  Having sex with you?"  Doe said, "No."  Bowman asked

where her girlfriend was when defendant "did this to you?"  Doe said, "Here."  Bowman

asked what her girlfriend was doing when it happened.  Doe said, "Looking."  Bowman

asked Doe, "[D]id you wanna have . . . his part right here in you?  Did you wanna do

that?"  Doe said, "No."  Bowman asked if defendant put his mouth anywhere on her

body.  Doe said, "No."  Bowman asked Doe what it felt like when defendant put "his boy

part in here?"  Doe said, "I don't know."  Bowman asked Doe how many times he did it;

"Two times?"  Doe replied, "Yeah."  When asked if he did both times the same day, Doe

said he did it "Two times, same day."

Bowman asked Doe if when he "opened her legs and put it in, was he making any

noise?"  Doe said, "No."  Bowman asked if defendant did it lots of times inside her and

then took it out or moved it a lot.  Doe said, "A little bit."  Bowman asked Doe which of

defendant's body parts she touched and what part of her did she touch him with.  Doe

responded, "My hand."  Bowman asked Doe:  "Did you ever open your mouth and put it

11

in?  No.  Did you ever stick hi – this – this is his boy part, right?  Did you ever stick it in your mouth?  No.  Just here?  Okay.  Um, so it just touched your lips?" Doe responded, "Right."  Bowman then asked, "so you put your hand on his thing – this boy part, yeah?  And, um, and you went like this?  Yes or no?  Yes you did that?  Okay.  And then y- then he put his boy part right here on your lips?  Did that happen?  Yes or no?  Yes.  And then he put his part inside you?  Or on – just here?  Like right here – see here's the top or did he put it inside you?"  Doe said, "Put it inside me."  Bowman said to Doe, "And then you went back to your friend's house and you told . . . ."  Doe said, "Her mom."  Bowman asked Doe where Doe's mom then took her.  Doe said, "Hospital."

Right after Bowman interviewed Doe, Sherriff's Investigator Patrick showed Doe six photographs and asked if any of the photographs were of defendant.  Doe pointed to a photograph.  Patrick did not tell her whether she correctly identified defendant.

E. *Expert Testimony by Nurse Practitioner Kelly Deckard*

Expert witness, nurse practitioner Kelly Deckard testified that she performed a forensic medical evaluation in which she reviewed the report of Doe's forensic medical examination performed by another nurse and photographs taken by the nurse on January 5, 2018.  Deckard also reviewed the forensic interview videotape.  Deckard testified that the photographs showed redness, superficial abrasions, lacerations, and irritation in Doe's genital area.  Deckard stated that the photographs indicated Doe had suffered some kind of trauma to her hymnal tissue.  Deckard further testified that she reviewed the forensic findings of vaginal penetration and medical abnormalities, examination photographs, and

12

history provided by Doe's forensic interview. She concluded Doe's injuries were suspicious and consistent with the history of what happened as stated by Doe during her forensic interview.

III.

ANALYSIS

Defendant contends the trial court abused its discretion by admitting into evidence Doe's police and forensic interviews, and that such evidentiary error was prejudicial. Because we conclude there was no prejudicial error, we need not determine whether defendant forfeited his objections to the interview evidence.

A. *Procedural Background Regarding Police and Forensic Interview Evidence*

Defendant filed pretrial motions in limine requesting exclusion of Doe's police and forensic interviews. Defendant argued that the interview videos were unnecessarily and prejudicially cumulative of Doe's and the interviewers' trial testimony, and Doe's interview statements were unreliable as the product of leading and highly suggestive questioning.

During the pretrial hearing on the motions in limine, defendant argued the forensic interview video did not qualify as a prior consistent statement and it consisted of leading questions primarily requiring yes or no answers. The prosecutor argued the jury should be given the opportunity to watch the video and determine whether Doe was a credible witness and able to give consent to sex. The prosecutor noted that the questions were yes-no questions because of Doe's difficulty communicating clearly. The prosecutor

13

added that the jury could see on the video whether Doe nodded her head affirmatively or negatively when responding to questions. The prosecutor also argued the forensic interview was a prior consistent statement. The court stated that, subject to reviewing the forensic interview video, and unless defense counsel convinced the court otherwise, the court was inclined to allow it.

The court next considered admissibility of the police interview video. The prosecutor explained that the interview occurred shortly after Mother took Doe to the hospital and reported the sexual abuse to Mother. The prosecutor argued the police interview was admissible to show Doe's emotional state and her demeanor before she had the forensic interview. The prosecutor further argued the police interview qualified as a prior consistent statement because defendant was likely going to argue the forensic interview was highly suggestive and unreliable. Defendant objected to the police interview video on the ground Doe's interview responses were tainted because she was told before the police interview that she had been raped. Also, during the interview, the nurse told Doe that defendant had committed a bad act against her.

The court stated that in light of defendant's potential trial argument that the forensic interview contained "suggestive-ism," it was important to establish what Doe had said before the forensic interview. Therefore the court permitted the forensic interview, as well as the police interview.

14

After Doe's trial testimony, out of the presence of the jury, counsel and the court again discussed playing the forensic interview for the jury. Although defendant did not renew his pretrial objection to the interview video, later, during cross-examination of Potter, defense counsel asked Potter if there could be potential problems with how the sexual assault counselor, Olson, presented the evidence and facts during Doe's police interview. Defendant's attorney, Joseph Cavanaugh, clarified: "Problems like how they present the person because it seems that Ms. Olson was helping with a lot of questions. It seems that that would be problematic." The court sustained the prosecutor's objection that the statement was argumentative.

Potter confirmed during her testimony that Olson was with Doe throughout the police interview, called Doe "'Sweetie,'" repeatedly stated to Doe that the interview was very difficult, and repeatedly told Doe she was in a "safe place." Olson told Doe she was "being brave," they "had to help get the bad guy." Potter also confirmed that Olson stated during the interview, "that's terrifying in regards to the incident," and repeatedly stated when Doe answered questions, "'You're doing a good job, Sweetie.'" Cavanaugh asked Potter additional questions suggesting that Olson was leading and influencing Doe during the police interview.

After Potter's testimony, outside the presence of the jury, the court and parties discussed the court's proposal to instruct the jury not to rely on Olson's statements and conduct during the police interview as evidence. The prosecutor objected on the ground such instruction would suggest Olson's conduct was improper. The prosecutor added

15

that, "By drawing attention to it you're playing into defendant's argument that this was suggested or coached." The court stated that it would give some thought as to how to instruct the jury that the attorneys' questions and questions asked in the video were not evidence, and only Doe's answers, including nodding her head, were evidence.

At the end of the trial, during counsel and the court's discussion of the jury instructions, the court asked counsel if they wanted to modify CALCRIM No. 222, the standard instruction on evidence, to address the interview video evidence in which there were statements made by a non-witness during the interview videos. The prosecutor stated that there was no need to modify the instruction. Counsel could argue that only Doe's statements in the interview videos were evidence, and jury could simply evaluate the evidence. Defense counsel argued that, as he stated earlier, the jury should be instructed that anything other than the witness's statements is not evidence.

The court suggested adding the sentence, "'The same analysis applies to audio or video evidence that was played to the jury.'" Defense counsel and the prosecutor said they were fine with that addition to CALCRIM No. 222 to address those other than Doe speaking during Doe's police and forensic interviews. But the prosecutor added that the addition would confuse the jury. The court agreed, declining to add the statement but noting that defense could include it in his closing argument.

B. *Applicable Law*

**"**Broadly speaking, an appellate court reviews any ruling by a trial court as to the admissibility of evidence for abuse of discretion." (*People v. Alvarez* (1996) 14 Cal.4th 155, 201.) The People argue defendant forfeited his objections to the police and forensic interview videos because he did not renew his pretrial motion in limine objections during the trial. The People additionally argue that the two interview videos were properly admitted into evidence as relevant evidence and qualified as consistent prior statements under Evidence Code sections 791, subdivision (b) and 1236.[1] In addition, the People argue the interview videos were admissible under the rule of completeness codified in section 356, as to the portions of the video interviews that may have been inadmissible.

"To be admissible as an exception to the hearsay rule, a prior consistent statement must be offered (1) after an inconsistent statement is admitted to attack the testifying witness's credibility, where the consistent statement was made before the inconsistent statement, or (2) when there is an express or implied charge that the witness's testimony recently was fabricated or influenced by bias or improper motive, and the statement was made prior to the fabrication, bias, or improper motive." (*People v. Riccardi* (2012) 54 Cal.4th 758, 802, citing §§ 791, 1236.) We are presented with the latter situation governed by subdivision (b) of section 791, concerning an express or implied charge that Doe's testimony and forensic interview statements were fabricated or influenced by bias or improper motive.

---

[1] Unless otherwise noted, all statutory references are to the Evidence Code.

C. *Discussion*

During the pretrial hearing on defendant's motions in limine and during the trial, defense counsel suggested that Doe's statements in her police and forensic interviews were not reliable, credible responses because they were the result of inappropriate influence, suggestibility, and leading. Defense counsel also argued that Olson inappropriately coached Doe by making remarks of endearment and other comments which defense counsel argued were inappropriate and improperly influenced Doe's responses. Under such circumstances, it was "generally proper to permit rehabilitation by a prior consistent statement." (*People v. Riccardi*, *supra*, 54 Cal.4th at p. 803, quoting *People v. Manson* (1976) 61 Cal.App.3d 102, 143.)

Doe's interview videos were thus admissible as prior consistent statements to refute defense counsel's implied assertions that Doe's testimony and interviews were unreliable and Doe was not a credible witness. (See *People v. Kopatz* (2015) 61 Cal.4th 62, 86, citing *People v. Collins* (2010) 49 Cal.4th 175, 216 [prior consistent statements admissible to rebut implied charge that witness's testimony was based on information in police report and coaching by others rather than on own recollection]; *People v. Brents* (2012) 53 Cal.4th 599, 616 [broad charge that witness's entire testimony was unreliable warranted admission of prior consistent statement to rehabilitate witness]; *People v. Riccardi*, *supra*, 54 Cal.4th at p. 803.)

As to the police interview, the trial court could have reasonably found that Doe's interview statements were reliable and credible responses, which were not unduly influenced by suggestive or leading questions or comments made to her before the interview. Her responses required questions that were very basic because, despite her age, Doe had limited understanding of what had happened and difficulty communicating verbally. The interviewers' questions did not appear to be unduly suggestive or leading.

The video of Deputy Potter's interview of Doe the day after the sexual offenses also demonstrated that Doe was extremely reluctant to speak about the incident, was scared and emotionally distraught, and did not appear to be motivated in any way to say anything other than what she believed had happened. Doe had a child-like demeanor and lacked cognitive ability, which made it improbable that her responses were intentionally untruthful based on any illicit motivation, even assuming she had been told before the interview that defendant had sexually abused her.

The subsequent forensic interview on January 9, 2018, four days after the police interview, included some leading questions and Doe does not appear in the video to be as emotionally distraught. Doe's responses during the forensic interview were consistent with her trial testimony and responses provided during the police interview.

Although some of the questions during Doe's forensic interview were leading, this most likely was because of her cognitive and speech disabilities impeding her ability to comprehend and respond to questions. Because the majority of the forensic interview was admissible to refute defendant's characterization of Doe's testimony and interview

19

statements as being unreliable, the trial court reasonably found that the entire interviews were admissible under the rule of completeness, which allows admission of the entire recordings if necessary to the understanding of the otherwise admissible portions. (§ 356; *People v. Riccardi*, *supra*, 54 Cal.4th at p. 803.) Here, the entire interview assisted the jury in evaluating Doe's communication limitations, disabilities, and credibility as a witness.

Regardless of whether the trial court abused its discretion in admitting the videos of the police and forensic interviews, any such evidentiary error was not prejudicial. The video could have been shown to the jury without sound, thereby avoiding admission of any hearsay and demonstrating Doe's child-like demeanor and emotional state during the forensic interview, supporting a finding Doe lacked the ability to consent to the sexual offenses and motivation to lie. (§§ 225, 1200 [Editor's Notes: "Evidence of a person's conduct out of court is not inadmissible under the hearsay rule expressed in [s]ection 1200 unless that conduct is clearly assertive in character. Nonassertive conduct is not hearsay."]; *People v. Leon* (2015) 61 Cal.4th 569, 603 ["Hearsay is defined as an out-of-court 'statement.' . . . A statement is defined for this purpose as an 'oral or written verbal expression or . . . nonverbal conduct *of a person*' intended as a substitute for oral or written expression."])

In addition, it is reasonably probable that defendant would have been convicted of the charged crimes even in the absence of the two interviews. The primary disputed issues at trial were not whether defendant engaged in the sexual acts of sexual intercourse

and oral copulation with Doe. The key issues were whether Doe had the capacity to consent to those sexual acts, whether Doe consented, whether defendant knew Doe did not have the capacity to consent, and whether he knew she did not consent. There was overwhelming evidence, apart from the interview evidence, that Doe did not consent and she was not capable of consenting, and defendant knew this.

The evidence established that at the time of the charged offenses, Doe was a 20-year-old adult women who behaved like and had the mental capacity of a child of about 10 or 11 years of age. She did not know what sexual intercourse was and she did not know the names of the parts of the male and female genitalia. She had difficulty communicating, including an inability to engage in conversation. Her limited speech was difficult to understand, if not incomprehensible. Several witnesses, including Mother, Doe's pediatrician, Deputy Potter, expert nurse practitioner Decker, and forensic interviewer, Bowman all testified that Doe's behavior was child-like and she had cognitive disabilities and very limited verbal skills.

Doe's trial testimony in 2022, also demonstrated her apparent limited ability to communicate and child-like demeanor. Her testimony consisted primarily of responses consisting of a few words, drawings, and nods of her head in the affirmative or negative. In this manner, Doe testified that, before the charged offenses, she had never had a boyfriend, had never had intercourse, did not understand what defendant was doing, was scared, and did not want defendant to take off her clothes, put his penis in her mouth, or put his penis in her vagina. The evidence of Doe's child-like demeanor, lack of speech,

21

and her cognitive disabilities demonstrated that she was unable to knowingly and voluntarily consent to the charged sexual acts, and that defendant was aware Doe could not and did not consent. Defendant did not testify or present any evidence refuting this.

The interview evidence was cumulative to the enormity of other evidence of the circumstances of the crimes and Doe's limited capabilities, as defense counsel noted when arguing defendant's pretrial motion to exclude the two interview videos. Because the videos were duplicative of Doe's trial testimony and other witness testimony, and thus cumulative, they did not add anything significant. Exclusion of the interview videos therefore likely would not have changed the outcome of the trial. Allowing them, even if error, thus was harmless. (*People v. Watson* (1956) 46 Cal.2d 818, 836; *People v. Arias* (1996) 13 Cal.4th 92, 157.)

IV.

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

RAMIREZ
P. J.

SLOUGH
J.